J-S22026-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| A.R.Z. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| C.M.B. | |
| Appellee | No. 1887 MDA 2016 |

Appeal from the Order Entered October 12, 2016
In the Court of Common Pleas of Cumberland County
Civil Division at No(s): 2016-4937 CIVIL

BEFORE:  SHOGAN, J., MOULTON, J., and PLATT, J.[*]

MEMORANDUM BY MOULTON, J.:                    **FILED JULY 17, 2017**

A.R.Z. ("Mother") appeals from the October 12, 2016 order entered in the Cumberland County Court of Common Pleas denying Mother's petition for a protection from abuse ("PFA") order.  We affirm.

On September 1, 2016, Mother filed a petition for a PFA order on behalf of R.R., a minor, against C.M.B. ("Father").  That same day, the trial court entered a temporary PFA order and scheduled a hearing for September 7, 2016.  Following a series of continuances, the trial court held a hearing on October 11, 2016.  On October 12, 2016, the trial court denied Mother's petition.  On November 14, 2016, Mother timely filed a notice of appeal.[1]

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] Although the order is dated October 12, 2016, notations on the order show that the Prothonotary entered the order on the docket and mailed
*(Footnote Continued Next Page)*

The well-reasoned opinion of the Honorable Jessica E. Brewbaker set forth the factual history underlying this appeal, which we adopt and incorporate herein. *See* Trial Ct. Op., 11/30/16, at 1-6 ("1925(a) Op.").

Mother raises two issues on appeal:

1. Did the [trial c]ourt err in determining there was insufficient evidence to grant a PFA order?

2. Did the [trial c]ourt err in not granting the PFA order considering C.[M.]B.'s inconsistent or false statements provided to the Guardian ad Litem and in testimony to the [trial c]ourt?

Mother's Br. at 6 (suggested answers omitted).

Mother argues that the trial court erred in concluding that the evidence was insufficient to grant a PFA order. The PFA Act, 23 Pa.C.S. §§ 6101-22, is intended "to protect victims of domestic violence from those who perpetrate such abuse, with the primary goal of advance prevention of physical and sexual abuse." *Buchhalter v. Buchhalter*, 959 A.2d 1260, 1262 (Pa.Super. 2009) (quotation omitted). PFA petitioners have the burden of proving the allegations of abuse by a preponderance of the evidence. *Ferko-Fox v. Fox*, 68 A.3d 917, 926-27 (Pa.Super. 2013). "The preponderance of the evidence is defined as the greater weight of the

*(Footnote Continued)* ────────────

copies of the order to the parties on October 14, 2016. Because the "day of entry [is] the day the clerk of the court or the office of government unit mails or delivers copies of the order to the parties," Pa.R.A.P. 108(a)(1), the 30-day appeal period began to run on October 14, 2016. Therefore, Mother's appeal is timely.

evidence, *i.e.*, to tip a scale slightly is the criteria or requirement for preponderance of the evidence." ***Id.*** at 927 (quotation omitted). "Our standard of review for PFA orders is well settled. In the context of a PFA order, we review the trial court's legal conclusions for an error of law or abuse of discretion." ***Boykai v. Young***, 83 A.3d 1043, 1045 (Pa.Super. 2014) (quotation omitted).

In both of her issues, Mother challenges the trial court's credibility determinations and asserts that the evidence she presented proved by a preponderance of the evidence that R.R. was entitled to a PFA order against Father. We disagree.

In its opinion, the trial court applied the relevant law and properly determined that Mother failed to show, by a preponderance of the evidence, that Father abused R.R. ***See*** 1925(a) Op. at 6-11. The trial court found that R.R.'s testimony lacked credibility, and the court carefully explained its reasons for so finding. ***See id.*** at 7-9. In contrast, the trial court found that Father's testimony, as well as the testimony of Father's witnesses, was consistent, credible, and, in some cases, supported by photographic evidence that contradicted R.R.'s testimony. "This Court defers to the credibility determinations of the trial court as to witnesses who appeared before it[,]" ***Ferko-Fox***, 68 A.3d at 927 (quotation omitted), which are supported by the record. Further, the trial court considered and weighed the evidence, including testimony, photographs, the guardian *ad litem*'s report, prior PFA orders, and psychiatric reports. After reviewing the parties' briefs,

the record, and the relevant law, we conclude that the trial court neither erred nor abused its discretion.  We affirm based on the trial court's reasoning.  *See* 1925(a) Op. at 6-11.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/17/2017

A.R.Z.
       Plaintiff

    v.

C.M.B
       Defendant

: IN THE COURT OF COMMON PLEAS OF
: CUMBERLAND COUNTY, PENNSYLVANIA
:
: No. 2016-04937 CIVIL
:
: CIVIL ACTION – LAW
: PROTECTION FROM ABUSE
:

### IN RE: OPINION PURSUANT TO P.A. R.C.P 1925

BREWBAKER, J., November 30, 2016

### Statement of Facts

Plaintiff   A.R.Z. ('("Mother") appeals this Court's October 12, 2016 order denying a Protection from Abuse ("PFA") order following a hearing on October 11, 2016. For the reasons that follow, the Court respectfully requests that the denial be affirmed.

We begin with a review of the evidence presented at the day-long hearing on October 11, 2016. R.R., a nine-year-old girl, testified first, in chambers, for approximately two hours. R.R. stated that during the weekend of August 12-14, 2016, she was at the beach in Maryland with her father, C.M.B ("Father"), and his girlfriend T.S. ("Girlfriend") at a trailer the couple owns. Immediately upon their arrival on Friday, R.R. testified that Father told her to go to her room or he would beat her. She further testified that after she went to her room, a party began five minutes later at which there was a significant amount of drinking and smoking, with about fifteen people in attendance inside the kitchen and hallway of the trailer. R.R. testified that almost immediately after the party began, Father threw a lamp in the hallway causing glass to shatter all over the floor.

When R.R. awoke the next day, she testified that a strange man was sleeping on the floor next to her bed, and when she went out into the hallway she cut her feet on the broken glass, which apparently was left there all night. Father was not sleeping in the trailer, so R.R. had to



walk three blocks to find him sleeping in a different trailer. R.R. testified that when Father asked about the broken lamp upon his return to the trailer and R.R. told him he had broken it, Father called her a liar and started spanking her. He then slapped her in the face, grabbed her arm, and swung her into the wall. R.R. testified that she was afraid he was going to kill her. R.R. also stated that her leg felt like it was broken, and that she had a bruise the size of a baseball. Later that day, R.R. went to the beach with Father where she admitted she did not wear shoes. She also testified that she did not have anything to eat all day or night on Saturday except for some French fries at the beach. Initially R.R. testified that she, Father and Girlfriend left Maryland on Saturday but on cross-examination she stated they left on Sunday. She stated that no party occurred on Saturday night, but instead she was left home alone the entire evening. R.R. testified that did not immediately tell anyone about the abuse because Father allegedly threatened to kill her if she told someone, but she eventually told her counselor about the abuse.

R.R. also testified regarding an incident during a soccer practice that occurred during the week following the weekend in Maryland. Father was an assistant coach for R.R.'s soccer team, and while R.R. was playing goalie, Father stated that she "kicked like a retard." R.R. stated that she is the regular goalie. R.R. also testified that after one practice Mother and Father got into a heated verbal argument. Because of these incidents and the fear she has Father will kill her, R.R. stated that she is having several nightmares. R.R. does not wish to see Father, even under supervised visitation.

Doctor Valentins Krecko testified on behalf of Mother and R.R. as an expert in child and adolescent psychiatry. Dr. Krecko performed a psychiatric evaluation of R.R. on September 27, 2016, after interacting with R.R. and her Mother for a total time of approximately two hours. During the first hour he spoke to Mother, following that with a conversation with R.R. Dr.

2

Krecko testified that it is his opinion that R.R. has suffered repeated physical abuse from Father and suffers from posttraumatic stress disorder. Dr. Krecko did not perform any physical examination; his opinion was based upon a self-reporting survey, known as the Impact of the Events Scale, done by R.R. and information provided by R.R. and Mother during their interviews.

Father adamantly denied the allegations of abuse and of hitting R.R. Father testified that he, R.R., and Girlfriend left for Maryland late on Friday evening around seven or eight o'clock. When they arrived, they unloaded the car and then Father walked R.R. over to a neighboring family's trailer. There, R.R. played with other children for approximately an hour before leaving and going to bed around ten o'clock. Father testified that after R.R. went to sleep, he and a few other adults sat on a neighbor's porch and talked for a few minutes before Father and Girlfriend went to bed themselves. Father denied throwing a lamp and stated that the trailer does not have any kind of free-standing lamp because all of the lighting is recessed or fixed. Father presented photos of the trailer showing the general layout of the trailer.

Father also testified that no stranger was sleeping in R.R.'s room the next morning. After waking up and having breakfast, R.R. left to play with the neighborhood children at the beach while Father remained behind to work on the trailer. Later that evening, R.R. and Father went jet skiing, and time-stamped photographs were introduced showing Father and R.R. together on the jet ski. After dinner, two of R.R.'s friends came over for a coloring party. Father introduced time-stamped pictures of the three children sitting in the kitchen coloring until approximately 11 p.m. Father testified that after the coloring party, one of the neighborhood girls had a sleepover with R.R. The following morning, R.R. rode her bike around the neighborhood and then went

3

back to the beach. Later that afternoon, Father, Girlfriend, and R.R. left Maryland and returned to Pennsylvania.

Father denied having said to R.R. that she "kicked like a retard" or that any heated argument occurred after practice with Mother. He testified that during the soccer practices the week following August 12 that he saw no change in R.R.'s ability to run or kick the ball. He never saw R.R. limp or favor one leg over the other. He also stated that during practices the children rotate positions constantly and that R.R. did not only play goalie.

On cross-examination, Father admitted that there have been two previous PFA orders entered against him, but testified that no criminal charges have ever been filed as a result of those complaints and that he had passed a polygraph examination. As a result of the previous PFA orders, Father's custody was limited to supervised visitation. When asked by the Court why he believed R.R. would make up the allegations, Father relayed a confusing story including Mother going to Nigeria and potentially taking R.R. with her without Father's consent, and a disagreement over R.R. continuing to be homeschooled as opposed to returning to public school.

Girlfriend's testimony largely corroborated Father's testimony regarding the events of August 12-14th, confirming that there was no heavy drinking or smoking that weekend and that a coloring party had taken place on Saturday evening followed by a sleepover. Girlfriend testified that she has never seen Father hit R.R. or any other signs of abuse, and that the trailer has never had a free-standing lamp. Girlfriend also detailed the meals she made for the three of them throughout the weekend.

One of the neighbors who also has a vacation trailer in Maryland, Kelby Mansi, testified on behalf of Father. Mansi testified consistent with Father and Girlfriend, stating that Father, Girlfriend, and R.R. arrived late Friday evening and Father and R.R. came over to the Mansi

4

trailer for approximately an hour. She denied that any kind of party took place, and stated that there were no movable lamps inside Father's trailer. Mansi confirmed that she spent Saturday evening at Father's trailer talking to Girlfriend and Father while two of her children and R.R. colored inside, after which one of her children stayed overnight at Father's trailer. Additionally, an offer of proof of the testimony of another neighbor and mother in Maryland, Nichole McCloskey, was made that was consistent with Father's, Girlfriend's, and Mansi's testimony.

Finally, R.R.'s soccer coach, Sam Kolokithas, testified that he did not see any sign of injury to R.R. during the few soccer practices that R.R. attended, other than having the wind knocked out of her, nor did he overhear Father saying that R.R. kicked "like a retard." However, Kolokithas did admit on cross-examination that he does not see everything taking place at a practice and that R.R. had only attended two practices before Mother withdrew her from soccer.

At the Court's request, Mother was called to testify on rebuttal. Mother testified that after the weekend of August 12-14, R.R.'s mood had changed. R.R. is now more quiet and subdued, as opposed to the outgoing and bubbly personality she had before. According to Mother, R.R. does not run around and play like she used to, has nightmares once a week, and bites her nails. Mother stated that she and Father discussed R.R. returning to public school, but R.R. indicated she wanted to continue to be home schooled so Mother did not pursue enrolling R.R. in public school. On cross-examination, Mother admitted that she did not immediately notice any signs of bruising or other signs of injury.

Trisha Fisher, an employee with Cumberland County Children & Youth Services, also testified. She stated that she had begun an investigation at the request of Maryland Children & Youth regarding the events of August 12-14. Fisher met with R.R. and took photographs of her

5

bruises on September 7, 2016. Fisher stated that Maryland, not Cumberland County, would make a determination as to whether the accusations were supported or unsupported.

After the hearing, the Court took the matter under advisement and issued an order on October 12, 2016 denying the request for a PFA. Mother filed the instant appeal on November 14, 2016.

## Analysis

As stated by our Superior Court, "[t]he purpose of the PFA act is to protect victims of domestic violence from the perpetrators of that type of abuse and to prevent domestic violence from occurring." *Ferko-Fox v. Fox*, 68 A.3d 917, 921 (Pa. Super. 2013). The petitioner has the burden of proving by a preponderance of the evidence the allegations of abuse. *See* 23 Pa. C.S. § 6107(a). The preponderance of evidence standard "is defined as the greater weight of the evidence, i.e., to tip a scale slightly is the criteria or requirement for preponderance of the evidence." *Commonwealth v. Brown*, 786 A.2d 961, 968 (Pa. 2001). In considering the sufficiency of the evidence to sustain the verdict, the evidence is viewed in the light most favorable to the verdict winner, granting that party the benefit of all reasonable inferences. *Curran v. Stradley, Ronon, Stevens & Young*, 521 A.2d 451, 454 (Pa. Super. 1987).

On appeal, the trial court's decision may only be overturned for abuse of discretion or error of law. *Ferko-Fox*, 68 a.3d at 920. Our Supreme Court has defined abuse of discretion as follows:

> The term 'discretion' imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion, within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused when the course pursued represents not merely an error of judgment,

but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

*Commonwealth v. Widmer*, 744 A.2d 745, 753 (Pa. 2000) (quoting *Coker v. S. M. Flickinger Co.*, 625 A.2d 1181, 1184-85 (Pa. 1993)).

In her concise statement of matters complained of on appeal, Mother alleges that the Court erred in determining there was insufficient evidence to grant a PFA order and that the Court erred in not granting the order considering Father's "inconsistent or false statements provided to the Guardian ad Litem and in testimony to the Court."

Turning to the facts of the present case, the Court did not find the testimony of R.R. credible because her version of events is directly contradicted by other credible evidence. Father, Girlfriend, and Mansi all credibly and consistently testified as to the events of the weekend of August 12-14, 2016, that there was no large drinking and smoking party and that R.R. was happy throughout the weekend, riding jet skis, going to the beach, and coloring and having a sleepover with other children. R.R.'s testimony that on Saturday she was home alone in the trailer is directly contradicted by the photographic evidence provided to the Court showing her and two other children engaged in a coloring party around 11:00 p.m. in the evening, happily smiling and enjoying themselves. Additionally, Father, Girlfriend, and Mansi all testified that there were no movable lamps inside Father's trailer that could be thrown, and photographs submitted to the Court support this testimony.

Regarding R.R.'s injuries, it is undisputed that R.R. had cuts to her feet and had injured her hip. However, the Court did not find that the injuries were caused by abuse. The cuts to R.R.'s feet can be explained by R.R.'s multiple trips to the beach, where she admitted that she did not wear any kind of shoes. Rocks, shells, and other objects in the sand could have caused

7

similar cuts to R.R.'s feet, and Girlfriend testified that R.R. had previously cut her feet on shells at the beach. Similarly, the Court does not find credible R.R.'s version of events which caused her hip injury. If, as R.R. testified, Father had thrown her into a wall and broken her leg or caused other serious injury, R.R. would have had great difficulty in walking and certainly would have been unable to play soccer two days later without showing some signs of injury that would have been noticed by her coach. While R.R. testified that she played goalie because she was injured, the testimony of her soccer coach and Father indicated that this was not the case. Instead, all the players rotated positions, and her coach did not see any indications that R.R. was having trouble playing. R.R. also went to practice two times after allegedly being seriously injured, including the Monday immediately following this beach weekend, as verified by a time-stamped photograph from August 15, 2016, showing R.R. on the soccer field, sweating in her uniform. Moreover, no expert testified on behalf of R.R. to explain the nature of R.R.'s injury or the potential causes for the injury. It is more likely that R.R.'s injury was caused playing soccer or any other equally likely scenario, rather than the implausible story of Father throwing her into a wall with a resulting serious injury that somehow went unnoticed for several weeks. The Court does not find that sufficient evidence was presented to prove that R.R.'s injuries were caused by abuse.

There are further minor inconsistencies or incredulities within the testimony of R.R. that supports the Courts' conclusion. R.R. testified that she did not eat for the entire day of August 13th, except for some French fries at the beach. However, Girlfriend testified that she, Father and R.R. had breakfast together, and then she made R.R. a peanut butter and jelly sandwich before they went to the beach together while Father was working on the trailer. Girlfriend testified that after Father and R.R. went back to the beach to ride the jet ski, the three of them

had Swedish meatballs and noodles for dinner together. Finally, Girlfriend testified that she served fruit, cheese and bologna to the three girls while they were coloring together that evening; that food is evident in the date-stamped photos of R.R. and her friends that were admitted into evidence.[1]

Furthermore, R.R. testified that Father made her take pictures with him on Sunday so that Mother would allow them to "stay longer;" however, the pictures were time-stamped for Saturday, and show R.R. expressing unbridled enthusiasm and happiness, both in pictures with Father and while coloring with her friends. The Court also finds the allegations that Father stated that R.R. "kicks like a retard" were not supported by adequate evidence. The only evidence that the statements were made came from the testimony of R.R. who, as indicated above, the Court does not find to be a credible witness.

While the Court is unsure of the motivations behind R.R.'s untruths, a possibility was revealed when R.R. testified that she was really unhappy that Father coaches her soccer team, because she wants her Mother to coach her team, but there are now too many coaches. Mother coaches R.R.'s little brother's team instead, a fact that greatly displeases R.R.

While there have been two previous PFA orders entered against Father alleging child abuse, no criminal charges arose out of those allegations, Father passed a polygraph examination, and the only change in the custody arrangement was that Father's custody with R.R. was supervised. Furthermore, one of those PFAs was entered into 2009 when R.R. was not yet three years old, and the other was entered in 2012 when R.R. was five years old. Though somewhat

---

[1] This particular picture was stamped "August 13, 2016, 10:53 p.m.," entirely corroborating Girlfriend's story and negating R.R.'s testimony regarding not being given any food, as it shows R.R. goofing around with two friends and various bowls of food at the table in front of them, rather than R.R.'s story that she was left home alone all night with no food.

9

alarming, the Court does not believe that these prior orders alone tip the balance in favor of granting the PFA.

The Court also does not place any significant value in the testimony and report of Dr. Krecko. Dr. Krecko interviewed R.R. for only an hour after talking to Mother first, and based his testimony and opinion exclusively upon the self-reported statements of R.R., including a fifteen question rating scale (although the Doctor testified he only uses eight of those) which asked the frequency of how often she thought about stressful life events. He did not do a physical examination, but merely asked her about her mood, thoughts, and anxiety, and admitted that "my opinion is based solely on what the child and what the mother tell me."

Finally, the Court notes that the Guardian Ad Litem's ("GAL") report indicates that R.R's description of events when interviewed by the GAL was "unusually consistent, but also not totally unbelievable." Further, according to the GAL, "[t]he most unusual thing about this whole case is the fact that the alleged abuse was to have occurred on August 12, 2016. The injuries are significant enough to warrant a trip to a doctor's office who prescribed physical therapy and a long absence from soccer, but were not noticed or reported for seventeen (17) days." The Court agrees that these factors cast further doubt upon the testimony and credibility of R.R.

## Conclusion

In conclusion, the Court does not find the testimony of R.R. credible, and the testimony of Dr. Krecko and the prior PFA's against Father are not sufficient to support a new PFA order.[2] Instead, the Court finds the testimony of Father, Girlfriend, Mansi, and Kolokithas credible and

---

[2] The testimony of Fisher, though credible, was largely used to introduce photographs she took of R.R.'s injuries. Mother was not present at the time of the alleged incidents and therefore her testimony, even if credible, lacks significant weight.

indicative that it is more likely than not that no abuse occurred on the weekend of August 12-14.[3] While the Court is significantly concerned about the motivations behind a nine-year-old girl making up false accusations of abuse and lying in court, the evidence presented, most notably the photographs as well as the testimony of Mansi and an offer of similar testimony by McCloskey, both disinterested parties corroborating Father's and Girlfriend's testimony, clearly indicate that at least some, if not all, of R.R.'s testimony was fabricated.

It is respectfully submitted that the trial court did not abuse its discretion or commit an error of law, and it is requested that the Superior Court affirm the trial court's Order of October 12, 2016 denying the PFA.

November 30, 2017

Jessica E. Brewbaker, J.

William M. Shreve, Esquire
Shreve Law Group
3618 North 6th Street
Harrisburg, PA 17110
For the Plaintiff

Lawrence Rosen, Esquire
1101 N. Front Street
Harrisburg, PA 17111
For the Defendant

Katie Maxwell, Esquire
54 E. Main Street
Mechanicsburg, PA 17055
Guardian Ad Litem

:rlm

Copies mailed
12/1/16
IM

---

[3] Regarding the second matter complained of on appeal, no specific statements are identified which are false or inconsistent. Upon review of the transcripts, the Court is unable to identify which statements are being referred to, and disagrees that Father's statements were false or inconsistent.

11